IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| WANDA C.,[1] <br>     Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, <br> Commissioner of Social Security <br>     Defendant. | Civil Action No. 3:19-cv-00049 <br><br> REPORT & RECOMMENDATION <br><br> By:   Joel C. Hoppe <br>         United States Magistrate Judge |

Plaintiff Wanda C. asks this Court to review the Commissioner of Social Security's final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings and oral argument, and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

1

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence,

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Wanda applied for DIB and SSI in Fall 2015,[3] *see* Administrative Record ("R.") 15, 265–80, ECF No. 8, alleging disability because of breast cancer, diabetes, an atrial septal defect, depression, high blood pressure, carpal tunnel syndrome, shoulder pain, bilateral feet and hand numbness, post-traumatic stress disorder, and obesity, R. 102–03, 119–20. She alleged that she became disabled on April 26, 2014, R. 102, 119, and later amended her alleged onset date to August 1, 2014, R. 46. She was forty-five years old, or a "younger" person under the regulations, on her amended alleged onset date. R. 102, 119; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied her claims initially in February 2016, R. 118, 135, and upon reconsideration in August 2016, R. 155, 173.

In August 2018, ALJ Brian Rippel issued an unfavorable decision after a hearing at which Wanda appeared with counsel and testified. R. 12–34. ALJ Rippel first found that Wanda had not engaged in substantial gainful activity since August 1, 2014, and that she met the Act's

---

[3] This is Wanda's second set of applications for DIB and SSI. Wanda initially applied for DIB and SSI in February 2012. *See* R. 82. ALJ Marc Mates issued an unfavorable decision on April 25, 2014. R. 79–100.

3

insured-status requirements through December 31, 2016.[4] R. 18. At step two, ALJ Rippel found that Wanda had several severe impairments: chronic pain syndrome, shoulder disorder, peripheral neuropathy of the bilateral lower extremities, degenerative disc disease, carpal tunnel syndrome, history of breast cancer, status/post remote surgical repair of ostium secundum atrial septal defect, asthma, obstructive sleep apnea, obesity, generalized anxiety disorder, major depressive disorder, post-traumatic stress disorder, and somatization disorder. *Id.* Her other impairments were non-severe because they did not "cause more than a minimal limitation to [her] ability to do basic work activities," either because they were adequately controlled with conservative treatment or because they were acute issues treated with "brief aggressive treatment" lasting fewer than twelve months. R. 19. At step three, ALJ Rippel concluded that none of Wanda's impairments, considered both alone and in combination, met or equaled any relevant Listing. R. 19–22 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 3.03, 4.06, 11.14, 13.10). ALJ Rippel then evaluated Wanda's residual functional capacity ("RFC") and determined that she could perform a full range of "light" work[5] with additional limitations. R. 22–32. She could lift and carry twenty pounds occasionally and ten pounds frequently; stand/walk and sit up to six hours in an eight-hour workday; occasionally balance, stoop, kneel,

---

[4] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Wanda] must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56. ALJ Rippel was required to consider Wanda's "complete medical history," 20 C.F.R. § 404.1512(d)(2), including any relevant evidence created after her DLI that suggested some link between her "post-DLI state of health and her pre-DLI condition," *Bird*, 699 F.3d at 341. Wanda's insured-status is not relevant to her SSI claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501.

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally push and pull bilaterally and reach overhead; frequently handle and finger bilaterally; and occasionally have exposure to extreme heat, respiratory irritants, and workplace hazards. R. 22. Wanda was also limited to simple, routine tasks in entry-level unskilled work, with routine customary breaks after about two-hours of work, in a low-stress job, defined as involving only occasional independent decision-making and occasional changes in the workplace setting. *Id.* She could have only occasional interaction with the public. *Id.*

Based on this RFC finding and the vocational expert's hearing testimony, ALJ Rippel concluded that Wanda was unable to return to her past relevant work as a fast-food worker. R. 32. Nonetheless, ALJ Rippel found at step five that Wanda could perform the requirements of certain light, unskilled occupations (marker, inspector grader, and packer) that offered a significant number of jobs in the national economy. R. 33–34; *see* R. 72–73. ALJ Rippel therefore concluded Wanda "not disabled" after August 1, 2014, and denied her applications for benefits. R. 34. The Appeals Council denied Wanda's request for review, R. 1–6, thereby making ALJ Rippel's written decision "the final decision of the Commissioner" denying her DIB and SSI claims for the period after August 1, 2014, R. 1. This appeal followed.

## III. Discussion

Wanda raises two arguments challenging ALJ Rippel's decision as it relates to her ability to use her hands. *See generally* Pl.'s Br. 8–10, ECF No. 15. She argues that ALJ Rippel (1) failed to explain how he resolved a material ambiguity in a medical opinion that he otherwise afforded great weight and (2) improperly substituted his lay opinion for the medical opinions of record. *Id*. Her arguments are not persuasive.

A.   *Summary*

*1.    Treatment Notes*

Wanda's medical history is complex. From 2013 through 2017, she sought treatment for various physical and mental health issues, including post-cancer recovery treatment, R. 1143–59, 1178–87, 1190–210, 1833–40, 2153–271; abdominal pain, R. 546–53, 620–25, 1655, 1659–63, 1815–19, 2280–83; sleep apnea, R. 590, 1339, 1380, 1410, 1748, 1756, 1824, 1925–26, 2015, 2620; diabetes, R. 1537, 1539, 2311; depression, anxiety, and post-traumatic stress disorder, R. 1322–446, 1756–71; and diffuse muscle pain, R. 1143, 1178, 1202, 1441, 1458, 1531, 1555, 1570, 1795, 1907, 2280, 2311, 2606.

Relevant to her arguments on appeal, Wanda also has carpal tunnel syndrome ("CTS"). In June 2015, she presented to Kelly Gwathmey, M.D., of the University of Virginia Health System, reporting numbness and pain in her extremities. R. 1859. Wanda explained that her hand "pain, numbness, tingling, and weakness" had been worsening for about a year, caused a "stinging sensation," and occasionally made her lose her grip and drop things. *Id.* She was taking gabapentin, prescribed by her primary care physician, and had "tried using wrist splints at night," but neither provided relief. *Id.*

Dr. Gwathmey diagnosed Wanda with bilateral carpal tunnel syndrome. R. 1862–63. On exam, Wanda had full grip strength, wrist flexion, and wrist extension, but "decreased pin prick [sensation] all over her upper extremities." R. 1862. An electromyogram (EMG) study produced abnormal results. R. 1862–63. It revealed "electrophysiological evidence of bilateral median neuropathies at the wrist (carpal tunnel syndrome)," which was of "mild" severity on Wanda's left wrist and "mild to moderate" severity on her right wrist. *Id.* Dr. Gwathmey referred Wanda to UVA's Hand Clinic for further treatment. R. 1863.

6

At the Hand Clinic, Wanda again reported "bilateral hand pain and numbness/tingling" for approximately one year. R. 1864. Physical exam findings were mostly normal. R. 1867. Kelsey Parente, PA-C, observed no thenar atrophy and negative provocative maneuvers for carpal tunnel syndrome and cubital tunnel syndrome. *Id.* Wanda could form a full composite fist, had intact sensation to light touch and normal capillary refill, and had a grip strength of four out of five bilaterally. *Id.* PA Parente discussed possible treatment options with Wanda and administered a lidocaine injection into her left wrist. R. 1867–68.

In July 2015, Wanda returned to the Hand Clinic. R. 1868–69. A physical therapist fitted her for wrist splints and directed her to wear them "at night and as needed during the day." R. 1869. One week later, Wanda returned to PA Parente. R. 1869–70. She reported that she had been wearing her splints and that the left wrist injection had not helped her symptoms. R. 1870. Physical exam findings were largely normal. *Id.* For example, Wanda had no deformity, swelling, or thenar atrophy, full range of motion of her wrists and fingers, negative provocative maneuvers for carpal tunnel syndrome and cubital tunnel syndrome, intact sensation to light touch, and grip strength of four out of five. *Id.* PA Parente administered another lidocaine injection—this time to Wanda's right wrist—and directed her to follow up in six weeks.

In September 2015, Wanda returned to the Hand Clinic. R. 1870–71. She reported that the injections had provided some limited relief. R. 1871 (noting a fifty percent improvement "for a few days"). She also noted that she had tried the splints but that they "cause[d] her skin to break out." *Id.* On exam, PA Parente noted positive carpal tunnel signs and decreased sensation to light touch on Wanda's right hand. R. 1873. She offered carpal tunnel surgery, but cautioned that "because [Wanda] did not receive excellent improvement" with the lidocaine injections,

7

"results from surgery may be variable." R. 1874. Wanda initially opted to proceed with the surgery, *id.*, but later said she was "unsure if she wanted to go through with it," R. 1880.

From 2015 through 2017, Wanda's examinations remained largely unchanged, and she received additional injections and was advised to continue wearing her splints, which the medical provider described as "conservative management" for CTS. R. 1881 (left wrist injection); R. 2326 (encouraging splint use); R. 2606 (prescribing orthotics); R. 2607 (injections in both wrists). Wanda reported some initial relief from these treatments, R. 1880, 2606, but continued to complain of pain, numbness, and tingling in her hands, *see* R. 2606 (noting that although left wrist injection provided "significant relief . . . for an extended period," her symptoms had "since recurred in full").

2.  *Medical Opinions*[6]

In March 2014, Tracy Buni, M.D., Wanda's primary care physician, completed a Medical Source Statement for Wanda's applications. *See* R. 2350. She opined that Wanda could lift fewer than ten pounds occasionally and frequently, could stand/walk and sit for fewer than two hours in an eight-hour workday, and would need multiple breaks throughout the workday. *Id.* She could never reach, manipulate small objects, or grasp, hold, and turn objects. *Id.* Dr. Buni added that Wanda had "diffuse persistent pain [and] numbness" in her hands and lower extremities, as well as trouble with mood and concentration. *Id.*

In February 2016, on initial review for DDS, Bert Spetzler, M.D., opined that Wanda could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; she could stand/walk and sit for about six hours in an eight-hour workday; she was not limited in her

---

[6] Wanda's arguments concern only her CTS and ability to use her hands. Accordingly, I do not summarize the medical opinions of record concerning Wanda's impairments and related functional limitations.

8

ability to push and pull with her hands and feet; she could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds; and she could occasionally balance, stoop, kneel, crouch, and crawl. R. 113. Wanda had no manipulative limitations. *Id.* In August 2016, on reconsideration for DDS, Roger Tims, M.D., affirmed Dr. Spetzler's opinion of Wanda's physical limitations, with the notable exception that Wanda did have manipulative limitations. R. 149–51. Specifically, Dr. Tims opined that Wanda was "limited" in her ability to handle and finger with both hands due to her "diagnosis and ongoing complications" from carpal tunnel. R. 150. She remained, by contrast, unlimited in her ability to reach and feel. *Id.*

Finally, in January 2018, Heidi Kelly, F.N.P., completed a Medical Source Statement regarding Wanda's impairments. R. 2347. She opined that Wanda could lift and carry ten pounds occasionally and frequently, could stand/walk for about two hours in an eight-hour day, was not limited in her ability to sit during an eight-hour day, and would need additional breaks during the workday. *Id.*

    3.    *Wanda's Statements*

Wanda submitted to DDS two Adult Function Reports describing her symptoms and functional abilities. *See* R. 369–76, 398–405. Therein, she explained that she prepared only simple meals, R. 370, 400, could do "a little cleaning every other day," with breaks to rest, R. 371, relied on her daughter to help with cleaning and on a friend to cut the grass, R. 372, 401, and went out to pick up groceries and personal items only about once a month, *id.* at 372. She used to enjoy making art posters, but "pain and numbness" in her hands prevented that activity, R. 373, and she did not attend social events because her legs and back bothered her when she stood for too long, R. 374, 403. Wanda reported that her symptoms affected her ability to perform most functions. *Id*. She estimated that she could lift five to ten pounds, R. 374, walk for

9

about fifteen minutes before needing a five minute break, *id.*, often needed spoken instructions repeated, R. 374, 403, and did not handle stress well, R. 375, 404.

In January 2018, Wanda testified before ALJ Rippel. R. 50–68. She explained that, among other ailments, numbness, tingling, and weakness affected her hands "[a]lmost all the time." R. 60–62. This frequently caused her to drop things. R. 62. Since she recovered from breast cancer, pain also affected Wanda's breasts and arms, preventing her from "reach[ing] up to get [any]thing." R. 59. Because of her various ailments, Wanda often attended three or more doctors' appointments in a month. R. 66–68.

B.     *The ALJ's Decision*

ALJ Rippel found that Wanda's chronic pain syndrome, shoulder disorder, and CTS were "severe" impairments because they "more than minimally limit[ed]" her ability to perform basic work activities, R. 18, which, according to the regulations include physical functions like "lifting, pushing, pulling, reaching, carrying, or handling," 20 C.F.R. §§ 404.1522(b)(1), 416.922(b)(1). At step three, he found that while there is "no specific [L]isting for" those impairments, the evidence failed to establish that the impairments medically equaled the severity of any listed impairment. R. 20. ALJ Rippel determined Wanda's RFC. R. 22; *see* R. 22–32. As relevant here, he found that she was limited to "occasional" lifting/carrying twenty pounds and "frequent" lifting/carrying ten pounds; never climbing ladders, ropes, or scaffolds; "occasional overhead reaching, pushing, or pulling bilaterally"; and "frequent[] handl[ing] and finger[ing] bilaterally."[7] R. 22.

---

[7] "'Frequent' [or 'frequently'] means occurring from one-third to two-thirds of the time," or about six hours during an eight-hour workday. SSR 83-10, 1983 WL 31251, at *6. "'Occasionally' [or 'occasional'] means occurring from very little up to one-third of the time" and "should generally total no more than about 2 hours of an 8-hour workday." *Id.* at *5.

ALJ Rippel then briefly summarized Wanda's subjective statements. R. 23. He found that her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." *Id.* He discounted Wanda's symptoms because her "statements concerning the[ir] intensity, persistence and limiting effects" were "significantly greater than expected based upon the documented objective findings." *Id.* ALJ Rippel explained that he came to this conclusion because Wanda received "relatively conservative" treatment, including "medication management, injections in her wrists for carpal tunnel syndrome, physical therapy, and psychotherapy." R. 28. He noted that Wanda's wrist splints and injections provided mixed results and that Wanda had not pursued carpal tunnel surgery. R. 24.

ALJ Rippel gave "great" weight to Dr. Spetzler's and Dr. Tims's medical opinions, R. 29, because their opinions were "based upon a thorough review" of Wanda's medical records and were "balanced, objective, and well-supported by the objective findings in the record," R. 30, which indicated that Wanda had mild degenerative disc disease, mild sleep apnea, mild to moderate carpal tunnel syndrome, and "routinely displayed no acute distress, normal gait, normal coordination, normal strength, intact reflexes and sensation, [and] no respiratory or cardiovascular issues," *id.* (citing R. 2338, 1853–58, 1950, 604, 1143–214, 1781–823, 1831–46, 1904–13, 2128–279, 2302–46, 2351–616). ALJ Rippel also noted that Dr. Tims's opinion warranted more weight than Dr. Spetzler's opinion "because [Dr. Tims] was specifically able to review and consider . . . new evidence related to [Wanda's] carpal tunnel syndrome" and thus included "additional limitations regarding [her] bilateral ability to handle and finger." R. 29. By contrast, ALJ Rippel gave Dr. Buni's and Nurse Kelly's opinions "little weight." R. 30. Both opinions, he noted, "appear[ed] to essentially just adopt [Wanda's] subjective allegations regarding her limitations and [were] not consistent with or supported by the objective findings in

11

the record." R. 30–31 (citing R. 2338, 1853–58, 1950, 604, 1143–214, 1781–823, 1831–46, 1904–13, 2128–279, 2302–46, 2351–616).

C.   *Analysis*

Wanda challenges ALJ Rippel's RFC assessment of her ability to use her hands. She argues that ALJ Rippel erred by failing to resolve a material ambiguity in the record. Pl.'s Br. 8–10. Specifically, she asserts that Dr. Tims should have used a "vocationally acceptable term (i.e., constant, frequent, occasional)" to describe her manipulative limitations. *Id.* at 8. Instead, he opined that Wanda's bilateral ability to handle and finger was "limited." *Id.* This created a material ambiguity, Wanda asserts, that ALJ Rippel failed to resolve. *Id.* Relatedly, Wanda argues that ALJ Rippel erroneously substituted his lay opinion for the medical opinions of record when he failed to articulate how a "limited" ability to handle and finger corresponded to a restriction to "frequent" handling and fingering in the RFC. *Id.* at 10.

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and related symptoms.[8] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "functional limitations or restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL

---

[8] "Symptoms" are the claimant's own description of her medical condition. 20 C.F.R. §§ 404.1502(i), 416.902(n).

12

658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

The ALJ has broad (but not unbounded) discretion to determine whether an alleged symptom or functional limitation is supported by or consistent with other relevant evidence, including objective evidence of the underlying medical impairment, in the claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 267–72 (4th Cir. 2017), and he built an "accurate and logical bridge from that evidence to his conclusion" that the claimant is not disabled, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quotation marks and other brackets omitted). *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019); *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662 (4th Cir. 2017).

ALJ Rippel's discussion of his reasons for restricting Wanda to "frequent" handling and fingering meets this "deferential" standard of review. *Jarvis v. Berryhill*, 697 F. App'x 251, 252 (4th Cir. 2017). As the Commissioner conceded at oral argument, Dr. Tims should have used a vocationally-acceptable term (i.e., constant, frequent, occasional, or never) to describe Wanda's manipulative limitations. The DDS disability determination form he completed specifically prompted him to use such terms. *See* R. 150 (directing the DDS physician to explain "the extent to which the [manipulative] function can be performed–e.g., constantly, frequently, occasionally, never, etc."). DDS physicians are directed to do so because these terms are defined in the *Dictionary of Occupational Titles* ("DOT") and are used to explain the physical requirements of

13

each job title. *See* Dep't of Labor, Office of Admin. Law Judges, Dictionary of Occupational Titles app. C ¶ IV(c) (4th ed. 1991). Per the *DOT*, "constantly" means that the activity or condition exists two-thirds or more of the time, "frequently" means that the activity or condition exists from one-third to two-thirds of the time, and "occasionally" means that the activity or condition exists up to one-third of the time. *Id.*; *accord* SSR 83-10, 1983 WL 31251, at *5–6. The *DOT* does not, by contrast, define the term "limited." Thus, Dr. Tims's use of the term "limited" was ambiguous and did not adequately explain the severity of Wanda's manipulative limitations. ALJ Rippel did not explicitly address this ambiguity. He gave great weight to Dr. Tims's opinion, but he then restricted Wanda to "frequent" handling and fingering in the RFC without discussing whether that restriction adequately accounted for Dr. Tims's assessment that Wanda had "limited" manipulative abilities. *See* R. 22–32.

      Nonetheless, elsewhere in his decision, ALJ Rippel *did* adequately discuss the available medical and other evidence regarding Wanda's carpal tunnel syndrome. He noted that Wanda's EMG study revealed mild-to-moderate carpal tunnel, she was treated only with wrist splints and wrist injections, and treatment had provided partial relief. R. 24. ALJ Rippel also discussed the relevant exam findings, noting that despite some decreased sensation and positive carpal tunnel signs, Wanda also repeatedly displayed normal strength, reflexes, coordination, and range of motion. *Id.* (citing R. 604, 2367, 2384, 2406, 2515, 2574, 2607). ALJ Rippel also explained that Wanda had received only conservative treatment and had not pursued carpal tunnel surgery. R. 24, 28. These reasons sufficiently explain why ALJ Rippel restricted Wanda to "frequent" bilateral handling and fingering in the RFC. *See Briley v. Berryhill*, No. 5:18cv43, 2018 WL 8368963, at *6 (E.D.N.C. Dec. 21, 2018) (finding ALJ properly restricted claimant to "frequent" handling and fingering where ALJ noted that claimant required only limited carpal tunnel

14

treatment and often showed normal motion, strength, and sensation on exam), *adopted by* 2019 WL 1330889 (E.D.N.C. Mar. 25, 2019); *Torain v. Berryhill*, No. 1:17cv816, 2018 WL 4158417, at *7–8 (M.D.N.C. Aug. 30, 2018) (finding restriction to "frequent" handling and fingering was supported by substantial evidence where ALJ explained that claimant had received only conservative carpal tunnel treatment, including "wearing splints at night, taking vitamin B6, and receiving a Cortisol injection"); *Hawkins v. Colvin*, No. 1:13cv2966, 2014 WL 5369777, at *14–15 (D.S.C. Oct. 22, 2014) (finding ALJ adequately explained why she restricted claimant to frequent handling and fingering where ALJ explained that claimant's carpal tunnel symptoms were inconsistent with physical exam findings, treatment was conservative, and medication provided some pain relief); *cf. Felton-Miller*, 459 F. App'x at 230–31 (explaining that the "ALJ was not required to obtain an expert medical opinion as to Felton-Miller's RFC" where he "properly based his RFC finding on [her] subjective complaints, the objective medical evidence, and the opinions of treating, examining, and nonexamining physicians").

Similarly, ALJ Rippel adequately explained why he followed Dr. Tims's medical opinion and discounted Dr. Buni's and Nurse Kelly's opinions. "Medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including her symptoms, prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The ALJ must adequately explain the weight afforded to every medical opinion in the record, taking into account factors such as the nature and extent of the source's treatment relationship with the claimant; how well the source explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the source's area of specialty. *Id.* §§ 404.1527(c), 416.927(c). Medical opinions from treating and examining physicians typically

deserve more weight than those from non-examining physicians, such as the DDS medical reviewers. *Brown*, 873 F.3d at 268; 20 C.F.R. §§ 404.1527(c), 416.927(c). A reviewing court "must defer to the ALJ's assignments of weight" among differing medical opinions unless her underlying findings or rationale "are not supported by substantial evidence" in the record, *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015), or they were reached by means of an improper standard or misapplication of the law, *see Coffman*, 829 F.2d at 517.

Here, ALJ Rippel supported his assessment of the relevant medical opinions with "specific and legitimate reasons." *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014). Although Dr. Tims was a non-examining DDS physician, ALJ Rippel noted that Dr. Tims was "specifically able to review and consider" the medical evidence relevant to Wanda's carpal tunnel syndrome and produced an opinion that was "based upon a thorough review of [Wanda's] updated medical records." R. 29. He also found Dr. Tims's opinion to be "balanced, objective, and well-supported by the objective findings in the record," including Wanda's EMG test showing mild-to-moderate carpal tunnel. R. 30 (citing R. 1853–58). This evidence supports ALJ Rippel's decision to rely on Dr. Tims's medical opinion. SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon*, 725 F.2d at 235 (noting that the findings of a "non-treating physician can be relied upon when [they are] consistent with the record"); *Malphrus v. Saul*, No. 4:19cv2439, 2020 WL 6193948, at *14 (D.S.C. Oct. 22, 2020) (finding ALJ decision to give "great weight" to DDS physicians' opinions was supported by substantial evidence where ALJ noted that they were supported by the record, including claimant's treatment history, exam findings, and daily activities).

ALJ Rippel also offered sufficient reasons for discounting the treating source opinions of record. He gave Dr. Buni's and Nurse Kelly's opinions "little weight" because they "appear[ed] to essentially just adopt [Wanda's] subjective allegations." R. 30. Moreover, they were "not consistent with or supported by the objective findings in the record," which supported only mild to moderate carpal tunnel syndrome and relatively normal physical exam findings. *Id.* The ALJ adequately discussed why the medical evidence did not support Dr. Buni's medical opinion of Wanda's extremely limited ability to use her hands. Furthermore, Nurse Kelly did not offer an opinion of Wanda's ability to use her hands. Thus, ALJ Rippel sufficiently explained why he declined to follow these opinions. *See Bishop*, 583 F. App'x at 67 (ALJ properly rejected treating physician's medical opinion where the ALJ explained the opinion was "inconsistent with the mild to moderate diagnostic findings, the conservative nature of [the claimant's] treatment, and the generally normal findings during physical examinations"); *Barbare v. Saul*, 816 F. App'x 828, 833 (4th Cir. 2020) ("[A]n ALJ . . . was not required to credit an opinion . . . consisting of short, conclusory statements untethered to clinical results."); *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020) (ALJ properly gave "little" weight to a medical opinion where the ALJ explained that it was "not supported with an explanation" and "not consistent with treatment records").

ALJ Rippel discussed Wanda's conservative course of treatment, cited her relatively normal exam findings, and explained why he credited Dr. Tims's medical opinion over Dr. Buni's and Nurse Kelly's opinions. Because ALJ Rippel adequately explained his reasoning, I find that his decision to restrict Wanda to frequent handling and fingering is supported by substantial evidence.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** Wanda's Motion for Summary Judgment and Motion for Remand, ECF No. 15, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 19, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 19, 2021

Joel C. Hoppe
United States Magistrate Judge